

Villanova University School of Law
Villanova University School of Law Digital Repository

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-18-2004

# Mercy Catholic Med v. Thompson

Precedential or Non-Precedential: Precedential

Docket No. 03-2292

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

## Recommended Citation

"Mercy Catholic Med v. Thompson" (2004). *2004 Decisions.* Paper 368.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/368

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES
COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 03-2292

———————

MERCY CATHOLIC
MEDICAL CENTER,
　　　　　Appellant

v.

TOMMY G. THOMPSON,
SECRETARY OF HEALTH
AND HUMAN SERVICES

———————

On Appeal from the
United States District Court for the
Eastern District of Pennsylvania
D.C. Civil Action No. 02-cv-00419
(Honorable Ronald L. Buckwalter)

———————

Argued April 19, 2004

Before: SCIRICA, *Chief Judge*,
GARTH and BRIGHT[*], *Circuit Judges*

(Filed: August 18, 2004 )

———————

[*]The Honorable Myron H. Bright,
United States Circuit Judge for the Eighth
Judicial Circuit, sitting by designation.

Mark H. Gallant, Esquire (Argued)
Cozen & O'Connor
The Atrium
1900 Market Street
Philadelphia, Pennsylvania 19103
　　　Attorney for Appellant

Michael Leonard, Esquire (Argued)
Department of Health & Human Services
Office of the General Counsel,
Region III
The Public Ledger Building, Suite 418
150 South Independence Mall West
Philadelphia, Pennsylvania 19106
　　　Attorney for Appellee

———————

OPINION OF THE COURT

———————

SCIRICA, *Chief Judge*.

At issue is an acute care hospital's reimbursement from Medicare for graduate medical training. Mercy Catholic Medical Center[1] seeks reversal of the Provider Reimbursement Review Board's decision denying reclassification of certain graduate medical education costs[2] and its refusal to adjust Medicare's reimbursement of operating costs. The

———————

[1]Mercy Catholic Medical Center is an acute care hospital located in Philadelphia.

[2]Graduate Medical Education costs refer to Medicare payments made to hospitals to support Medicare's share of costs related to medical training programs and to support higher patient costs associated with the training and education of residents.

Board also found Mercy Catholic Medical Center did not provide sufficient documentation to justify a reclassification and recision of costs. The District Court affirmed the Provider Reimbursement Review Board's decision and granted summary judgment to the Secretary of the Department of Health and Human Services. We will reverse and remand.

## I.

### A. Statutory Background

The federal Medicare program, administered by the Centers for Medicare and Medicaid Services[3] of the United States Department of Health and Human Services, is the largest public program financing health care services for the aged and disabled. Hospitals that provide services to Medicare patients are reimbursed for their expenses under Title XVII of the Social Security Act (the "Medicare Act"), 42 U.S.C. § 1395 *et seq.* Part A of the Medicare Act authorizes payment to participating hospitals ("providers") for their direct and indirect costs of providing inpatient care to beneficiaries. 42 C.F.R. § 413.9(a), (b). Medicare also reimburses teaching hospitals for the costs of graduate medical education, including physician time for instructing and supervising interns and residents. 42 U.S.C. § 1395ww(h).

Medicare services are furnished by "providers of services"[4] that have entered into provider agreements with the Secretary of the United States Department of Health and Human Services. 42 U.S.C. §§ 1395x(u), 1395cc. To receive payment from the Secretary, providers are required to comply with the provider agreement, as well as all Medicare statutes and regulations. 42 U.S.C. § 1395cc(b)(2).

From its inception, Medicare reimbursed hospitals for all reasonable incurred costs related to providing medical care to patients. The Medicare Act defines "reasonable cost" as "the cost actually incurred," less any costs "unnecessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). Under the historical system of reasonable cost reimbursement, no reimbursement distinction turned on whether costs were reported as operating costs (the day-to-day expenses incurred in running a business) or graduate medical education costs. Medicare paid its full pro rata share of all allowable graduate medical education costs and operating costs actually incurred, consistent with the statutory requirement preventing shifting the costs of services incurred on behalf of Medicare beneficiaries to other patients or third party payers. 42 U.S.C. § 1395x(v)(1)(A).

---

[3]Centers for Medicare and Medicaid Services was formerly known as the Health Care Financing Administration.

[4]As defined by 42 U.S.C. § 1395x(u), a "provider of services" means "a hospital, critical access hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency, [or a] hospice program."

In 1982, Congress modified the Medicare program to require hospitals to render services more economically. In the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub. L. No. 97-248, Congress amended the Medicare Act by imposing a ceiling on the rate-of-increase of inpatient operating costs recoverable by a hospital. Under TEFRA, costs were still reimbursed on a reasonable cost basis, but subject to rate-of-increase limits. The rate-of-increase limit was computed according to a "target amount," which, in turn, was calculated according to a hospital's allowable net Medicare operating costs in the hospital's base year. *See* 42 U.S.C. § 1395ww(b); 42 C.F.R. § 413.40(c) (2002).

In 1983, Congress amended the Medicare Act again, establishing a prospective payment system for reimbursing inpatient operating costs of acute care hospitals. *See* 42 U.S.C. § 1395ww(d). Hospitals now are reimbursed on the basis of prospectively determined national and regional rates for each discharge, rather than on the basis of retrospectively determined reasonable costs incurred. Under this system, payment is made at a predetermined rate for each hospital discharge, according to the patient's diagnosis.

The prospective payment system was phased in over four years, during which hospitals were reimbursed a combination of the prospective payment system hospital-specific rate and the prospective payment system national and regional rates. A hospital's specific rate is based on its operating costs during a particular base year. *See* 42 C.F.R. §§ 412.71, 412.73. For most hospitals the prospective payment system base year was FY 1983. Therefore, for the first four years of the prospective payment system, a hospital's reimbursement was still significantly affected by its actual operating costs in the FY 1983 base year. As part of the prospective payment system transition period, the Health Care Financing Administration promulgated the Consistency Rule, which required graduate medical education costs for cost reporting periods during the prospective payment system transition period be determined in a manner "consistent with the treatment of these costs for purposes of determining the hospital-specific . . . rate." 42 C.F.R. § 412.113(b)(3). In effect, the Consistency Rule locked in the classification of graduate medical education costs and operating costs from the prospective payment system base year (FY 1983) forward.

The TEFRA and prospective payment system reimbursements applied only to inpatient operating costs. Graduate medical education costs were specifically excluded from the definition of "inpatient operating costs." 42 U.S.C. § 1395ww(a)(4), 1395ww(d)(1)(A). Thus, graduate medical education costs continued to be reimbursed under the previous reasonable cost system until 1986.

In 1986, Congress enacted a separate prospective payment system for graduate medical education costs for all cost reporting periods beginning on or

3

after July 1, 1985. 42 U.S.C. § 1395ww(h). Central to this new payment system was the determination of the base average per-resident amount ("APRA"). The APRA is determined by dividing the hospital's base year graduate medical education costs by the number of full-time-equivalent residents working at the hospital in the base year. The graduate medical education base year is the hospital's fiscal year beginning during the federal fiscal year 1984. 42 U.S.C. § 1395ww(h)(2)(A). For most Pennsylvania hospitals, this is the fiscal year ended June 30, 1985. The APRA then serves as the base figure in the formula to calculate graduate medical education reimbursements for 1985 and future cost years. 42 U.S.C. § 1395ww(h)(2)(C), (D); 1395ww(h)(3).

### 1. Determining the APRA.

In 1990, to assure maximum accuracy of each hospital's APRA determination, the Secretary required fiscal intermediaries[5] to reaudit all hospitals'

---

[5]The Medicare program uses "fiscal intermediaries," generally private insurance companies, to perform many of the program's administrative functions. Fiscal intermediaries are responsible for determining the amount of payments to be made to providers. In the present case, Mercy Catholic Medical Center's fiscal intermediary at the relevant time was Independence Blue Cross. The Intermediary, in turn, engaged a subcontractor, in this case Johnston,

1985 graduate medical education base year costs. The reaudit would ensure the future payments would be based on an accurate determination of the hospitals' graduate medical education costs in the base-year. To prevent over-reimbursement, the regulations instruct intermediaries to deduct from each reaudited hospital's base year graduate medical education amount any operating costs misclassified as education costs. 42 C.F.R. § 413.86(e)(1)(ii)(B). To prevent under-reimbursement, the regulations authorize intermediaries, "upon a hospital's request," to include in the base year graduate medical education amount any teaching costs misclassified as operating costs in the base-year cost report. 42 C.F.R. § 413.86(e)(1)(ii)(C). After determining the hospital's APRA upon reaudit, the intermediary notifies the hospital of the amount by a Notice of Average Per Resident Amount ("NAPRA"). 42 C.F.R. § 413.86(e)(1)(v). The hospital may appeal this amount to the Secretary within 180 days of the NAPRA. *Id.*

To support a claim for reclassification of misclassified graduate medical education costs, a hospital must present the intermediary with "sufficient documentation" requiring a change in the classification of costs. 42 C.F.R. § 413.86(l)(2)(ii). The regulations required actual documentation developed during the base year that was maintained in an

---

Young & O'Fria, to conduct the graduate medical education reaudit.

4

auditable format. *See* 42 C.F.R. § 405.481(g) (1986); Medicare Program; Changes in Payment Policy for Direct Graduate Medical Education Costs, 54 Fed. Reg. 40,301 (Sept. 29, 1989).

The Secretary recognized, however, that some hospitals would no longer have the records required to support a reclassification of costs. As such, the Secretary allowed auditors to accept time records from subsequent time periods as proxy. "*Graduate Medical Education: Documentation to Support the Physician Cost/Time Allocation*" (1990), JA 211-215.[6] Where subsequent year records were also unavailable, hospitals were allowed to perform three-week time studies[7] of current physician workloads to provide a rough estimate of the time allocation of teaching physicians in the base year. *See* Medicare Program; Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1991 Rates, 55 Fed. Reg. 36,064.

The Secretary noted these alternative forms of documentation were inherently less reliable than contemporaneous records from the

---

[6]The policy was later published in the Federal Register at 55 Fed. Reg. 35,990, 36,063-64 (Sept. 4, 1990).

[7]In performing a time study, a physician would, on a daily basis, log time worked for a provider over a period of several weeks allocating time to various activities such as administration, supervision, or teaching of interns and residents.

graduate medical education base year. *Id.* A limited exception was created restricting the use of substitute documentation from later years to verify costs originally claimed as graduate medical education costs in the graduate medical education base year, but disallowing the use of documents from later years to increase the graduate medical education costs originally claimed. As published in the Federal Register, the Secretary's interpretation read:

> As an equitable solution to the problem of the nonexistence of physician allocation agreements, time records, and other information, we are allowing providers to furnish documentation from cost reporting periods subsequent to the base period in support of the allocation of physician compensation costs in the GME base period . . . . In no event will the results obtained from the use of the records from a cost reporting period later than the base period serve to increase or add physician compensation costs to the costs used to determine the per resident amounts.

55 Fed. Reg. at 36,063-64.

### 2. Adjusting Hospital-Specific Rate and Target Amount for Misclassified Costs.

A hospital may also request the reclassification of misclassified operating costs. Misclassified operating costs are costs that had been included as graduate medical education costs in the graduate medical education base year, but were reclassified by the intermediary as operating costs. 42 C.F.R. § 413.86(e)(1). If the misclassified operating costs were treated as graduate medical education costs in both the graduate medical education base year and the prospective payment system base year, an upward adjustment of the hospital's specific rate or TEFRA target amount may be warranted since the hospital-specific rate and target amount are derived from operating costs in a base year. 54 Fed. Reg. 40,286, 40,289 (Sept. 29, 1989). Conversely, if the reaudit revealed misclassified graduate medical education costs (which would increase the ARPA), a corresponding downward adjustment of operating costs for the graduate medical education base year was required. *Id.*

The regulations allow a hospital to "request that the intermediary review the classification of the affected costs in its rate-of-increase ceiling or prospective payment base year for purposes of adjusting the hospital's target amount or hospital-specific rate." 42 C.F.R. § 413.86(l)(1)(i). To reclassify these costs, a hospital must specifically "request review of the classification of its . . . costs no later than 180 days after the date of the

[NAPRA]" and "include sufficient documentation to demonstrate to the intermediary that adjustment of the hospital's hospital-specific rate or target amount is warranted." *Id.* § 413.86(l)(1)(ii).

## B. Facts

On December 21, 1989, Mercy Catholic Medical Center received notice the Intermediary ("Independent Blue Cross") was reopening its cost reports for FYE ("Fiscal Year Ended") 1985, 1986, 1987 and 1988 to perform the reaudit under the graduate medical education regulation. During the reaudit, the Intermediary made several downward adjustments to Mercy Catholic Medical Center's graduate medical education costs but refused to make other adjustments to its graduate medical education costs and operating costs. The Intermediary's downward adjustment of graduate medical education costs and refusal to reclassify certain operating costs as graduate medical education costs reduced Mercy Catholic Medical Center's APRA from $81,745 to $73,657. Mercy Catholic Medical Center filed a timely appeal of the Notice of Average Per Resident Amount with the Board.

At the time, however, Mercy Catholic Medical Center no longer possessed all of the original supporting documentation of its base year graduate medical education costs because the governing rules only required hospitals to

6

retain physician allocation agreements[8] (also known as "339s") for four years from the close of FYE 1985 (i.e., until June 30, 1989). Furthermore, Mercy Catholic Medical Center had experienced a flood in the basement storage area and discarded all damaged records that were beyond their retention date.

Mercy Catholic Medical Center did, however, retain some of the 339s for the departments in question. At oral argument before this Court, both parties stipulated some 339s were included in the administrative record, although not included as formal exhibits. The Provider Reimbursement Review Board, however, did not acknowledge them. *See Mercy Catholic Med. Ctr. v. Blue Cross Blue Shield Ass'n*, PRRB Dec. No. 2001-D55 (Sept. 28, 2001), Medicare and Medicaid Guide (CCH) ¶ 80,747, at 202,481 ("PRRB Dec.") ("[T]here was insufficient evidence regarding forms 339 and physician allocation agreements.").[9]

During late 1990, however, Mercy Catholic Medical Center conducted a three-week time study that tracked what portion of each teaching physician's time was devoted to services that qualify as graduate medical education costs. During the reaudit, Mercy Catholic Medical Center realized it had misclassified all of the time spent by physicians in three Departments—OB/GYN, Laboratory, and Radiology—as operating costs in the graduate medical education base year. Even though these physicians had in fact been providing substantial graduate medical education services, it had been Mercy Catholic Medical Center's historic practice to report as operating costs all costs for physicians whose duties were not primarily teaching. *Id.* The 1990 time studies included all of the physicians who performed teaching duties in 1985, including those in the three "missing departments." In seeking graduate medical education credit, Mercy Catholic Medical Center timely requested the requisite downward adjustment to its hospital-specific rate and target amount under 42 C.F.R. § 413.86(l)(2).

In performing the reaudit, the Subcontractor ("Johnston, Young & O'Fria") accepted Mercy Catholic Medical Center's 1990 time studies as accurate and compliant with the Health Care Financing Administration's instructions of June 22, 1990, and relied upon them to reduce the compensation and related teaching costs Mercy Catholic Medical Center had claimed as graduate medical education expenses. The Subcontractor advised Mercy Catholic Medical Center, however, that it had been instructed by the Intermediary ("Independence Blue Cross") to strictly limit its reaudit to only those

_____

[8]A physician allocation agreement specifies the respective amount of time a physician spends on teaching and supervision as opposed to time spent on patient care. 55 Fed. Reg. at 36,063.

[9]The 339s were not supported by contemporaneous time sheets or "source documentation." Oral Argument Transcript at 29-30.

FYE 1985 costs that Mercy Catholic Medical Center had reported as graduate medical education costs in the graduate medical education base year—to validate or reduce those costs—and to ignore evidence of any other costs, including physician and support expenses, that had previously been claimed in FYE 1985 as operating costs. Accordingly, the Subcontractor declined to review time studies and other documentation pertaining to these three missing departments while, on the basis of the 1990 time studies, the Intermediary reclassified $719,055 in graduate medical education costs from FYE 1985 as operating costs and excluded that amount from the APRA calculation.

According to Mercy Catholic Medical Center, the reclassifications reduced its total graduate medical education costs from $6,876,731 to $6,157,676, and its APRA from $81,745 to $73,657. Recognition of the misclassified graduate medical education costs from the three missing departments based on the 1990 time studies, which the Intermediary refused, would have resulted in an APRA of $79,685.80. The retrospective application of the disputed APRA reduced Mercy Catholic Medical Center's reimbursement by approximately $2,500,000 from FY 1986-91, and by approximately $250,000 to $500,000 annually. Mercy Catholic Medical Center also lost approximately $275,000 in hospital-specific rate reimbursement during the prospective payment system transition period as a result of the refusal to increase the hospital-specific rate to include Mercy Catholic Medical Center's misclassified operating costs, and is losing approximately $50,000 to $200,000 in annual reimbursement for its psychiatric unit as a result of the refusal to increase Mercy Catholic Medical Center's target amount.

In addition to requesting credit for graduate medical education costs attributable to the three missing departments, Mercy Catholic Medical Center also asked the Intermediary to increase its hospital-specific rate and target amount to include any operating costs that, based upon the 1990 time studies, had properly been determined to have been misclassified in FYE 1985 as graduate medical education costs. *See* 42 C.F.R. § 413.86(l). Mercy Catholic Medical Center also requested a corresponding downward adjustment to its hospital-specific rate and target amount if any physician compensation costs originally classified as operating costs were reclassified as graduate medical education costs. *See* 42 C.F.R. § 413.86(l)(2). Finally, Mercy Catholic Medical Center asked the Intermediary to increase the hospital-specific rate and the target amount of its prospective payment system-exempt psychiatric unit to include the operating costs determined to have been erroneously reported in FY 1985 as graduate medical education costs under § 413.86(e)(1)(v) and (l)(1). The Intermediary refused to make the requested hospital-specific rate and target amount adjustments.

## C. The Provider Reimbursement Review Board's Decision

Mercy Catholic Medical Center appealed two issues to the Provider Reimbursement Review Board: (1) the Intermediary's refusal to recognize the graduate medical education costs from the three missing departments in the APRA and; (2) the Intermediary's refusal to increase its hospital-specific rate and target amount to take into account those costs that were reclassified from graduate medical education costs to operating costs in the reaudit. The Board held a hearing and issued its decision on September 28, 2001.

The Board affirmed the Intermediary on both issues. As a threshold matter, the Board agreed with Mercy Catholic Medical Center that over-allocations and under-allocations of base year graduate medical education costs were properly subject to correction during the reaudit under 42 C.F.R. § 413.86(e), because the statute and GME rule envision "a 'two way street' of changing erroneously claimed GME costs to operating costs ('OC') and vice versa." PRRB Dec. at 202,480. In light of this, the Board found the Intermediary had incorrectly instructed its Subcontractor to ignore the time studies and other evidence of misclassified graduate medical education costs (as opposed to misclassified operating costs). PRRB Dec. at 202,480-81. In fact, the Board's decision included the following finding:

15. The HCFA instructions reinforced this concept; however, an addendum consisting of questions and answers was incorrectly interpreted by the Intermediary as meaning that no new GME costs could be added by the re-audit from OC.

a. The Intermediary, IBC [Independence Blue Cross], wrongfully instructed the audit subcontractor not to increase the GME costs by reclassifying any misclassified OC.[10]

The Board found nonetheless "there [was] no creditable evidence in the record to reclassify the misclassified OC to GME costs because of the lack of form 339's and the fact that the 1990 time studies were not audited by the Intermediary, nor is there adequate documentation in the record regarding these time studies." PRRB Dec. at 202,481.

On the second issue, the Board agreed Mercy Catholic Medical Center had timely requested revision of its hospital-specific rate and target amount. *Id.* It concluded, however, the Intermediary was

_____

[10]We think the Board intended "misclassified GME" in this finding. But the result is the same: The Board found originally claimed graduate medical education costs could be increased by adding misclassified costs.

not required to revise the hospital-specific rate or target amount because Mercy Catholic Medical Center had not provided the required documentation directly to the Intermediary within 180 days of the Notice of Average Per Resident Amount.

## D. District Court Decision

The District Court affirmed the Board. *Mercy Catholic Med. Ctr. v. Thompson*, No. 02-419, 2003 U.S. Dist. LEXIS 4688 (E.D. Pa. Mar. 5, 2003). Reviewing the first issue, the District Court determined the limited exception to the requirement for contemporaneous documentation restricted the use of substitute documentation from later years to verify costs originally claimed as graduate medical education costs in the graduate medical education base year, and did not serve to add or increase costs to the original graduate medical education costs claimed. *Id.* at *22-23. For support, the Court cited the Secretary's representations that later year records "were inherently less reliable," and that providers had "significant incentives to inflate their GME costs in the base year under the new methodology." *Id.* at *24 (quoting *Presbyterian Med. Ctr.*, No. 95-1939, 1998 U.S. Dist. LEXIS 6254, at 12-13 (D.D.C. April 21, 1998), *aff'd*, 170 F.3d 1146 (D.C. Cir. 1999)).

The District Court also affirmed on the basis of lack of documentation. The Court found Mercy Catholic Medical Center's claims suspect because the administrative record lacked contemporaneous evidence of 339's in the three missing departments. The Court wrote: "[t]he record indicates that Mercy no longer had any of the 339s and that Mercy did not submit any other evidence [to support a reclassification of costs], other than the time study conducted in 1990." *Id.* at *24-25. Although recognizing Mercy Catholic Medical Center was not notified of a reaudit until after the record retention period had expired, the District Court nonetheless concluded Mercy Catholic Medical Center could be penalized for failing to maintain its 339 forms because it had received "constructive notice" that those costs "would likely be the subject of ongoing review." *Id.* at *27.

On the second issue, the District Court affirmed the Board's ruling that Mercy Catholic Medical Center was not entitled to increases in its hospital-specific rate and target amount because it failed to present documentation comparing Mercy Catholic Medical Center's FY 1983 and 1985 graduate medical education programs directly to the intermediary, noting that it was the hospital's "burden . . . to present sufficient evidence." *Id.* at *33.

## II.

We have jurisdiction under 28 U.S.C. § 1291. We review the grant of summary judgment de novo. *Fertilizer Inst. v. Browner*, 163 F.3d 774, 777 (3d Cir. 1998). Like the District Court, we review a final decision of the Secretary[11]

---

[11]In this case, the Board's decision was the final decision of the Secretary.

under 42 U.S.C. § 1395oo(f)(1), which incorporates the standard of review of the Administrative Procedure Act, 5 U.S.C. § 706. Under the APA, we will affirm unless the Secretary's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] unsupported by substantial evidence." 5 U.S.C. § 706(2)(A),(E); *Robert Wood Johnson Hosp. v. Thompson*, 297 F.3d 273, 280 (3d Cir. 2002). But when applying this standard, a reviewing court may not merely rubber-stamp the Secretary's actions, but must ensure that the agency's ruling is neither clearly erroneous nor inconsistent with applicable regulations. *Thomas Jefferson Univ. Hosp. v. Shalala*, 512 U.S. 504, 512 (1994). Further, we may affirm the agency's decision only on grounds on which the agency actually relied, and not on the basis of alternative rationales or justifications put forward by counsel on appeal. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

## III.

### A. Graduate Medical Education Costs

#### 1. As Applied to the Facts of this Case, the Secretary's Interpretive Rule is Arbitrary and Capricious.

Mercy Catholic Medical Center contends the Secretary's failure to consider its 1990 time studies to the extent they supported a positive adjustment to its reported FY 1985 graduate medical education costs was arbitrary and capricious. As a threshold matter, we must determine the level of deference, if any, to afford the Secretary's interpretation of the graduate medical education reaudit rule.[12]

As noted, when it became clear providers did not always retain contemporaneous time records to facilitate the reaudit, the Secretary issued a special graduate medical education cost documentation rule for reaudits as an official instruction to fiscal intermediaries, "*Graduate Medical Education: Documentation to Support the Physician Cost/Time Allocation*" (1990), JA 211-215. The Secretary's written interpretation provides that later-year time studies, of the sort relied on by Mercy Catholic Medical Center, could only serve to verify costs that were originally claimed as graduate medical education costs in the base year, and could not support the addition of costs not originally claimed as graduate medical education costs. The limited exception to the record-keeping policy provides:

> As an equitable solution to the problem of the nonexistence of physician allocation agreements, time records, and other information, we are allowing providers to furnish the documentation from cost reporting periods subsequent to the base period in support of the

---

[12]The District Court did not explicitly address the level of deference it warranted the Secretary's interpretive rule.

allocation of physician compensation costs in the GME base period . . . . It is only in the absence of base period documentation that subsequent documentation should be considered as a proxy for base period documentation for purposes of determining the per resident amount. *In no event will the results obtained from the use of the records from a cost reporting period later than the base period serve to increase or add physician compensation costs to the costs used to determine the per resident amounts.*

55 Fed. Reg. at 36,063-64 (emphasis added).[13]

_____

[13]The Agency supplemented its rule with the following question and answer:

> Question: If a provider did not charge physician compensation to GME in the base period, can it request that documentation from a subsequent period be used, at this time, to revise its base period costs for the purpose of calculating its average per resident amount?
>
> Answer: No. As explained

Following its interpretation, the Secretary now argues the limited exception to the rule requiring contemporaneous documentation only allows the use of records from subsequent cost reporting periods to verify costs and allocations claimed as graduate medical education costs during the graduate medical education base year—not to support increases to those costs in the base year.

We owe no deference to an agency interpretation plainly inconsistent with the relevant statute. *See Pub. Employees Retirement Sys. v. Betts*, 492 U.S. 158, 171 (1989) ("[N]o deference is due to agency interpretations at odds with the plain language of the statute itself."). In the same vein, an agency's interpretation of its own regulations is not entitled to substantial deference by a reviewing court where "'an alternative reading is compelled by the regulation's plain meaning or by other indications of the Secretary's intent at the time of the regulation's promulgation.'" *Thomas*

_____

> in HCFA's instructions, the use of subsequent period documentation to support the allocation of physician costs may not be used to increase the amount of physician compensation originally claimed by the provider in its GME base period. *Graduate Medical Education: Questions and Answers* (Nov. 8, 1990), JA 872.

12

*Jefferson Univ. Hosp.*, 512 U.S. at 512 (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)). Mercy Catholic Medical Center contends the graduate medical education rule is written in neutral language that compels intermediaries to accurately calculate graduate medical education costs, and to correct all misclassified costs, operating costs and graduate medical education costs, to arrive at the most accurate APRA possible. We agree and find the Secretary's interpretation directly contradicts the plain language of the graduate medical education regulation and cannot be upheld.

The plain language of the graduate medical education rule does not support limiting corrections upon reaudit to misclassified operating costs, but rather anticipates corrections of misclassified graduate medical education costs and operating costs.

42 C.F.R. § 413.86(e) and (l) provide:

> (e) Determining per resident amounts for the base period – (1) For the base period. (i) . . . the intermediary determines a base-period per resident amount for each hospital as follows . . .
>
> (ii) In determining the base period amount under paragraph (e)(1)(i) of this section, the intermediary – . . .

> (A) *Verifies the hospital's base-period graduate medical education costs* and the hospital's average number of FTE residents;
>
> (B) Excludes from the base-period graduate medical education costs any nonallowable or misclassified costs, including those previously allowed under § 412.113(b)(3) of this chapter; and
>
> (C) *Upon a hospital's request, includes graduate medical education costs that were misclassified as operating costs during the hospital's prospective payment base year and were not allowable under § 412.113(b)(3) of this chapter during the graduate medical education base period.* These costs may be included only if the hospital requests an adjustment of its prospective payment hospital-specific rate or target amount as described in paragraph [(l)(2)] of this section.
>
> (l) Adjustment of a hospital's target amount or prospective payment hospital-specific rate – (1)

Misclassified operating costs . . .

(2) Misclassification of graduate medical education costs – (i) General rule. If costs that should have been classified as graduate medical education costs were treated as operating costs during both the graduate medical education base period and the rate-of-increase ceiling base year or prospective payment base year and the hospital wishes to receive benefit for the appropriate classification of these costs as graduate medical education costs in the graduate medical education base period, the hospital must request that the intermediary review the classification of the affected costs in the rate-of-increase ceiling or prospective payment base year for purposes of adjusting the hospital's target amount or hospital-specific rate.

42 C.F.R. § 413.86(e), (l) (emphasis added).

The regulation's plain language requires the Intermediary to correct all misclassified costs, not just misclassified graduate medical education costs. The Secretary's restrictive approach conflicts with the regulatory language.

Additionally, the intent of the rule supports our interpretation. In promulgating § 413.86, the Secretary determined a reaudit of FY 1985 cost reports was warranted because hospitals may not have accurately distinguished between teaching time and administrative and other time spent by teaching physicians in FY 1985, since at that point in time there were no real reimbursement consequences either way, and Intermediaries had applied the audit rules inconsistently. 54 Fed. Reg. 40,286, 40,288-89, 40,301-02. In this vein, the Secretary noted: "In establishing the base-period per resident amount for a specific hospital . . . it is important that the amount determined be an accurate determination of providers' 1984 GME costs." 54 Fed. Reg. 40,286, 40,288. The goal of an accurate determination of costs supports both increases and decreases to 1984 graduate medical education costs. The Secretary's intent is particularly relevant to this case where Mercy Catholic Medical Center is not seeking to add additional costs not audited in 1985, but rather, seeks to *reallocate* operating costs as graduate medical education costs based on the same time studies the Intermediary relied on to reclassify costs in the opposite direction.

Our position is consistent with the Supreme Court's interpretation of the graduate medical education reaudit rule in *Regions Hosp. v. Shalala*, 522 U.S. 448 (1998). In upholding the reaudits, the Court wrote, the audits were required "to catch errors that, if perpetual, could grossly distort future reimbursement." 522

14

U.S. at 457-58. To make the APRA accurate and avoid perpetrating errors, the reaudit requires correcting all relevant classification errors, not merely those that result in a reduction of graduate medical education costs.

As noted, we find the reaudit rule envisions a two-way street. The Secretary's interpretation is at odds with this principle. Significantly, the Provider Reimbursement Review Board agreed, holding the graduate medical education rule required reclassification of misclassified graduate medical education costs and operating costs. PRRB Dec. at 202,480. In doing so, the Board explicitly discredited the interpretation of the rule adopted by the Secretary in this litigation.

Even if the Secretary's interpretation were not at odds with the plain language of the rule, his interpretation is still not entitled to *Chevron*-level deference.[14] An Agency interpretation "'qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *George Harms Constr. Co. v. Chao*, 371 F.3d 156, 161 (3d Cir. 2004) (quoting *United States v. Mead Corp.,* 533 U.S. 218, 226-27 (2001)). Agency statements contained in opinion letters, policy statements, agency manuals, and enforcement guidelines lack the force of law and "do not warrant *Chevron*-style deference." *Christensen v. Harris County*, 529 U.S. at 587; *Madison v. Res. for Human Dev., Inc.*, 233 F.3d 175, 185 (3d Cir. 2000). "To grant Chevron deference to informal agency interpretations would unduly validate the results of an informal process." *Madison*, 233 F.3d at 186. We have made clear that agency interpretive guidelines "do not rise to the level of a regulation and do not have the effect of law." *Id.* (quoting *Brooks v. Village of Ridgefield Park*, 185 F.3d 130, 135 (3d Cir. 1999)).

As for the persuasiveness of agency interpretive guidelines, we continue to rely on the framework laid out in *Skidmore v. Swift*, 323 U.S. 134 (1944). *See Christensen*, 529 U.S. at 587; *Madison*,

---

[14]In *Presbyterian Medical Center*, 1998 U.S. Dist. LEXIS 6254, *aff'd*, 170 F.3d 1146, the District Court for the District of Columbia held the Secretary's instruction on the use of later time-records was an "interpretive rule," and afforded the rule *Chevron* deference. *Id.* at *9. We note *Presbyterian* was decided before *Christensen v. Harris County,* 529 U.S. 576 (2000), where the Supreme Court clarified the deference due agency opinion letters. *See id.* at 587 (declining to afford *Chevron* deference to Department of Labor's opinion letter). We believe the instruction at issue is an interpretive rule. *See* 5 U.S.C. § 553(b)(A) (discussing informal rule-making without notice and comment). But we disagree with the level of deference granted in *Presbyterian Medical Center.*

233 F.3d at 186. The *Skidmore* Court explained:

> We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

323 U.S. at 140.

Under *Skidmore* analysis, we find the Agency has inconsistently applied the Secretary's instructions concerning what costs can be recognized in the reaudit process. In *Abbott v. NW Mem'l Hosp.*, PRRB Dec. No. 95-D10, Medicare & Medicaid Guide (CCH) ¶ 42, 970 (Dec. 7, 1994) *aff'd*, HCFA Adm'r Dec., Medicare & Medicaid Guide (CCH) ¶ 43,136 (Feb. 2, 1995), the provider presented base year physician allocation agreements, but did not produce supporting time records from the base year.[15] The HCFA Administrator determined that subsequent year time studies may be used to increase physician compensation in excess of amounts originally claimed in the graduate medical education cost center if the time studies were consistent with contemporaneous data. The Administrator subsequently repudiated his earlier position, *see Presbyterian Med. Ctr.*, 1998 U.S. Dist. LEXIS 6254, and adopted his current position, that the amount claimed in the graduate medical education cost center could only be increased based on contemporaneous documentation, not subsequent period time studies. "The Secretary is not estopped from changing a view . . . believe[d] to have been grounded upon a mistaken legal interpretation," *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993), but this inconsistency can affect the level of deference afforded an agency's interpretation. *See Skidmore*, 323 U.S. at 140. The Secretary's internally conflicting positions on this issue militate against affording deference to the interpretive rule.[16]

---

[15]As noted, Mercy Catholic Medical Center did retain some of its 339 allocation agreements, and these were included in the administrative record.

[16]Mercy Catholic Medical Center also argues the Secretary endorsed a position inconsistent with that taken in the current case when defending the validity of the graduate medical education rule before the Supreme Court in *Regions*, 522 U.S. 448.

16

In *Regions*, the Supreme Court considered the broader issue of whether the Secretary's enactment of the rule providing for a retrospective reaudit of graduate medical education costs was a reasonable interpretation of the graduate medical education amendment, 42 U.S.C. § 1395ww(h), under *Chevron*. The Court conditioned its affirmance of the graduate medical education rule on the understanding that hospitals would not be penalized for lack of documentation which they were no longer required to maintain. *Id.* at 465. The Secretary overcame this problem through the "equitable solution" discussed above. According to Mercy Catholic Medical Center, Government counsel suggested the Secretary would allow providers to add to, as well as decrease, base-year graduate medical education costs based on the following discussion at oral argument:

> Question [Breyer, J.]: I would just like to be clear in my own mind. What petitioner said . . . [is] that they have changed the classification of certain fixed costs, the administrative costs, from education costs to operating costs, not because of new evidence but because petitioner no longer had audit documentation . . . . Am I right in thinking that isn't the problem, because if

there are some pieces of paper and other evidence that are no longer around, the Secretary will permit the hospital to introduce –

Ms. Blatt [government counsel]: Yes

Question: – other evidence, later evidence, or anything that –

Ms. Blatt: That's correct, and ironically, Justice Breyer, the petitioner did present subsequent year data . . . because the [old] time records did not break . . . down the costs [sufficiently] . . . they were allowed to use a new time study, and that's why there was a settlement in this case, the petitioner actually got an increase in the per-resident average . . . .

Oral Argument Transcript at 16, *Regions Hospital v. Shalala*, No. 96-1375, 1997 WL 751915 (U.S.S.Ct. Dec. 1, 1997). Based on this interchange, Mercy Catholic Medical Center argues that the principle of judicial estoppel should prevent the Secretary from switching positions in this litigation. Because we find the Secretary's interpretive rule contrary to the plain language of the regulation, inconsistently

Nonetheless, the Secretary argues its interpretative rule is reasonable and entitled to deference. Contending later year records are inherently less reliable, the Secretary argues it is reasonable to limit the weight afforded to these records. According to the Secretary, hospitals may attempt to manipulate graduate medical education costs with documentation developed after the base year, for purposes of increasing their APRA.

In *Presbyterian Medical Center v. Shalala*, 170 F.3d 1146 (D.C. Cir. 1999), the Court of Appeals for the D.C. Circuit noted the Secretary's interpretive rule was reasonable because:

> GME costs claimed in the base year have already gone through a verification process requiring contemporaneous documentation. Additional GME costs claimed during reaudit have not. Because later year record are inherently less reliable, and because hospitals have significant incentives to inflate their GME costs in the base year . . . we think the interpretive rule, by prohibiting noncontemporaneous records from supporting GME costs . . . reasonably furthers — not frustrates — accurate determination of GME costs."

*Id.* at 1150-51 (internal quotations and citations omitted). We respectfully disagree.

We see no valid reason to generally ascribe to teaching hospitals wrongful over-reporting of teaching costs. Because of the Consistency Rule, hospitals had no opportunity to change classification of costs in FY 1985 from that reported in FY 1983, the prospective payment system base year. 42 C.F.R. § 412.113(b)(3). Nor did teaching hospitals have a financial incentive to misallocate either graduate medical education costs or operating costs in the prospective payment system base year, 1983, as Medicare reimbursed both education costs and operating costs on a reasonable cost basis during that period. Consequently, there is no reason to expect errors in cost reporting in 1984-85 would have favored reporting costs in one category or the other. Additionally, since § 1395ww(h) was enacted in 1986 and mandated the use of FY 1985 as the graduate medical education base year—a year which predated this change in the law—to set the APRA, providers had no notice or opportunity to "game the system" by over-reporting teaching costs.[17]

---

applied, and lacking valid reasoning, we do not reach Mercy Catholic Medical Center's judicial estoppel argument.

[17]The Secretary's Interpretive Rule does not clarify the difference between adding graduate medical education costs not

previously claimed, and reclassifying misclassified graduate medical education costs previously classified as operating costs. The district court in *Presbyterian* noted the specific question before the court was "whether later year records can be used to support an increase in GME costs over what was originally claimed in the base year." 1998 U.S. Dist. LEXIS 6254, at *9. In discussing the Secretary's interpretive rule, the court noted: "In [the Secretary's] judgment, however, she did not think it appropriate for hospitals to be able to use later year records to support an increase in GME costs over what hospitals had originally claimed." *Id.* at *12-13; *see also Cleveland Clinic Found. v. Shalala*, No. 1:94 CV 2414, 1996 WL 636135, at *2 (N.D. Ohio, Aug. 28, 1996) (rejecting provider's "attempts to claim additional costs no[t] previously claimed in the base year period").

Unlike the situation in *Presbyterian* and *Cleveland Clinic*, Mercy Catholic Medical Center's requested reclassification of misclassified graduate medical education costs would serve only to partially offset the graduate medical education costs that were found by the Intermediary to have been misclassified on reaudit, and would not raise Mercy Catholic Medical Center's graduate medical education costs above the amount contemporaneously claimed in FY 1985.

In *Abbott* as well, the graduate medical education cost additions did not result in total graduate medical education costs in excess of the amount the hospital had previously claimed. There, the Provider Reimbursement Review Board noted:

> The provider is not attempting to increase or add the physician compensation cost to the costs claimed on its 1984 cost report which was used to determine the Provider's per resident amount. All of the costs that the Provider has claimed were claimed in the base year, although they may not have been claimed specifically in the Intern and Resident cost center.

*Abbott*, Medicare & Medicaid Guide (CCH) ¶ 42, 970, at 42,898.

The Agency supplemented its interpretive rule with the following question and answer:

> Question: If a provider did not charge physician compensation to GME in the base period, can it request that documentation from a subsequent period be used, at this time, to revise its base period costs for the purpose of calculating its average per resident amount?
>
> Answer: No. As explained in HCFA's instructions, the use of subsequent period documentation to support the allocation of physician

The Secretary's interpretation requires the Intermediary to apply the graduate medical education reaudit rule in a one-sided fashion. An agency acts arbitrarily and capriciously when it construes or applies a regulation in an inconsistent manner. *See Walter Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 799 (D.C. Cir. 1984) ("It would be arbitrary and capricious for HHS to bring varying interpretations of the statute to bear [in allocating costs to Medicare], depending on whether the result helps or hurts the Medicare's balance sheets . . . .").

Furthermore, the Secretary's interpretation eschews the fundamental goal of neutral accuracy in a reaudit. *See, e.g., Boswell*, 749 F.2d at 799; *County of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999). In *County of Los Angeles*, the Court of Appeals for the D.C. Circuit rejected the Secretary's explanation for selectively ignoring data where it would increase Medicare payments based

---

costs may not be used to *increase the amount of physician compensation originally claimed by the provider in its GME base period.*
*Graduate Medical Education: Questions and Answers* (Nov. 8, 1990), JA 872 (emphasis added). As this case concerns *misclassified* graduate medical education costs, we find the Secretary's position concerning costs not originally claimed, does not support the Secretary's interpretation as applied to this case.

on "[a] long line of precedent [establishing] . . . that an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *Id.* at 1022 (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996)). The court held the Secretary's discretion, although broad, "is not a license to . . . treat like cases differently." *Id.* at 1023 (quoting *Airmark Corp. v. FAA*, 758 F.2d 685, 691 (D.C. Cir. 1985)).

By allowing non-contemporaneous records to verify graduate medical education costs or deduct graduate medical education costs claimed in the base-year cost report, but not allowing such records to support the inclusion of graduate medical education costs misclassified as operating costs, the Secretary's interpretive rule frustrates the regulatory goal of ensuring an accurate determination of a provider's graduate medical education costs. The Secretary either credits or ignores later year time studies depending on whether the correction of errors will result in a reduction or increase in a hospital's graduate medical education reimbursement. The Secretary's restrictive interpretive rule is arbitrary and capricious because it contradicts the plain language of the rule, has not been applied consistently, and is unreasonable.[18]

---

[18]The Secretary's rule may also effect an illegal cost-shifting of Medicare costs to non-Medicare patients, as it will shift costs properly borne by Medicare to other patients. *See* 42 U.S.C.

## 2. Evidentiary Issues Support Remand.

Mercy Catholic Medical Center contends the District Court and the Board erred in rejecting its appeal on the added ground that Mercy Catholic Medical Center failed to produce form 339 physician allocation agreements for the three missing departments. We recognize the able District Court was presented with a confusing administrative record. Nonetheless, we reverse and remand based on the alternative ground that contemporaneous evidence of teaching programs, including 339 forms, was presented to the Provider Reimbursement Review Board.

There is no dispute that Mercy Catholic Medical Center conducted accredited medical residency programs in its Laboratory, OB/GYN, and Radiology Departments in 1984-85. Before the Board, Mercy Catholic Medical Center introduced contemporaneous documentation verifying its graduate medical education activities. The Board found: "In fiscal year 1985, the provider conducted GME teaching programs in its OB/GYN, Laboratory, and Radiology Departments." PRRB Dec. at 202,480. Yet, the Board noted, "[t]here is no creditable evidence in the record to reclassify the misclassified OC to GME costs because of the lack of form 339's . . . ." *Id.* at 202,481. The District Court also concluded, "[t]he record indicates that

Mercy no longer had any of the 339s and that Mercy did not submit any other evidence, other than the time study conducted in 1990." *Mercy Catholic Med. Ctr.*, 2003 U.S. Dist. LEXIS 4688, at *24-25.

At oral argument, and in a subsequent letter to this Court, Mercy Catholic Medical Center proved that some original 339s from the missing departments had been included in the administrative record, though, apparently, not as formal exhibits.[19] To the extent the Provider Reimbursement Review Board and the District Court grounded their decisions on Mercy Catholic Medical Center's inability to produce copies of the 339 forms for the three missing departments, it is clear that at least some of these forms were produced in the administrative record.[20] Therefore, we will

---

§ 1395(x)(v)(1)(A).

---

[19]According to Mercy Catholic Medical Center's letter to this Court dated May 4, 2004, a "departmental 339 allocation" form for the Radiology Department was introduced as PRRB Exhibit 32.

[20]Although no 339 forms for individual doctors were included in the appendix to this Court, a "departmental 339 allocation" form for all teaching physicians in the Radiology Department in 1985 was included. JA 381. Health Care Financing Administration's instructions to intermediaries specify that such "departmental time allocations may be accepted" on reaudits. *Instructions for Implementing Program Payments for*

reverse and remand on the alternative ground that sufficient contemporaneous documentation of teaching programs in the "missing departments" was produced to support the reclassification of costs and should have been considered by the Board.

In sum, the Secretary's position that later year time studies may only be used to correct misclassified operating costs, and not misclassified graduate medical education costs, is arbitrary and capricious. We will reverse and remand with instructions to the Provider Reimbursement Review Board to order the Intermediary to recalculate Mercy Catholic Medical Center's graduate medical education costs after auditing the time studies and other available documentation from the three missing departments.

## B. Hospital-Specific Rate and Target Amount

Mercy Catholic Medical Center also contends the District Court failed to order the Intermediary to increase its hospital-specific rate and TEFRA target amount. As noted, the Board declined to order the Intermediary to increase Mercy Catholic Medical Center's hospital-specific rate and target amount in an amount corresponding to the Intermediary's reduction of the same costs from the APRA because Mercy Catholic Medical Center had not provided documentation directly to the Intermediary, but rather to the Subcontractor. PRRB Dec. at 202,481.

---

*Graduate Medical Education Costs*, JA 341.

The District Court affirmed, noting, "[t]he fact that the Subcontractor may have the documents in its possession does not satisfy the requirements set forth by the regulations." *Mercy Catholic Med. Ctr.*, 2003 U.S. Dist. LEXIS 4688, at *33-34. We cannot agree.

As noted, an increase in the hospital-specific rate and target amount is anticipated by the Secretary's own regulations to achieve consistent classification of costs where costs originally classified as graduate medical education costs should have been reported as operating costs. *See* 42 C.F.R. § 413.86(l)(1). Additionally, because of the Consistency Rule, allowable operating costs involved in setting the hospital-specific rate and target amount must be treated consistently throughout the prospective payment transition period (i.e. Mercy Catholic Medical Center's FY 1985-1989). 42 C.F.R. § 412.113(b)(3).[21] Once it is determined that misclassified

---

[21]Mercy Catholic Medical Center also contends that because its Target Amount applied only to a psychiatric unit not in operation until FY 1985, there was no rational basis to require Mercy Catholic Medical Center to introduce documentation evidencing the comparability of its FY 1983 and FY 1985 costs as a precondition to increasing the target amount. Therefore, no "comparability data" was necessary to adjust the target amount, and the Board's finding on insufficient documentation was irrelevant to the target amount adjustment.

graduate medical education costs should have been reimbursable as operating costs, an increase to the hospital-specific rate and target amount is required not merely for consistency purposes, but also in light of Medicare's cost-shifting prohibition. 42 U.S.C. § 1395x(v)(1)(A). For these reasons, the hospital-specific rate/target amount adjustment is critical. Mercy Catholic Medical Center's request for a revision of both its hospital-specific rate and target amount was appropriate and timely.

As discussed, the Provider Reimbursement Review Board did not deny the adjustments for substantive reasons. *See* PRRB Dec. at 202,481. Mercy Catholic Medical Center had provided the appropriate and sufficient documentation to the Intermediary's Subcontractor.[22] JA 161. The Board, however, refused to order the hospital-specific rate and target amount

---

[22]The record demonstrates the evidence provided by Mercy Catholic Medical Center was sufficient to make the adjustments to the hospital-specific rate and target amount. The Board found "the Subcontractor . . . had received adequate information for . . . revisions to the HSR/TEFRA target amount." PRRB Dec. at 202,481. In fact, the "best evidence" of comparability between the prospective payment system and graduate medical education base years was the cost reporting data and supporting audit records that were already in the Intermediary's possession until at least 1992. JA 156.

adjustments on the technicality that Mercy Catholic Medical Center provided the data supporting comparability within the 180 day period to the Intermediary's Subcontractor rather than directly providing it to the Intermediary. PRRB Dec. at 202,481. We do not find this distinction legally significant.

Providing data to the on-site Subcontractor is the legal equivalent of providing the data to the Intermediary under Centers for Medicare and Medicaid Services Manuals and principles of agency. In collecting data for an audit, the Subcontractor steps into the shoes of the Intermediary. *See Medicare Intermediary Manual*, JA 919. A subcontracted audit firm is authorized to receive cost reports and make its working papers available to the Intermediary for review and to obtain necessary information. *See id.* pt. F ("The independent audit firm's [Subcontractor's] working papers, including permanent files and reviews of internal control, are to be made available to representatives of the Secretary and the intermediary, at all reasonable times, for review and obtaining any necessary information."). Under the *Medicare Intermediary Manual*, the Intermediary and the Subcontractor are interchangeable in the function of receiving documents. The Board's decision also described the Intermediary performing audits "through its Subcontractor." PRRB Dec. at 202,466.

Under these circumstances, we find the documents were plainly within the control of the "prime contractor" (in this case, the Intermediary). In the context of

23

Fed. R. Civ. P. 34(a), so long as the party has the legal right or ability to obtain the documents from another source upon demand, that party is deemed to have control. *See* Fed R. Civ. P. 34(a) (allowing "[a]ny party [to] serve on any other party a request . . . any designated documents . . . which are in the possession, custody or control of the party upon whom the request is served); *see also Poole v. Textron*, 192 F.R.D. 494, 501 (D. Md. 2000) ("[A] party is charged with knowledge of what its agents know or what is in the records available to it.") (internal quotation omitted). In the Rule 34 context, control is defined as the legal right to obtain required documents on demand. *See Gerling Int'l Ins. Co. v. Comm'r*, 839 F.2d 131, 140 (3d Cir. 1988); 8A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2210 (2d ed. 1994). The *Medicare Intermediary Manual* specifically requires the Subcontractor's working papers and files be made available to the Intermediary and Secretary at all "reasonable times." *Medicare Intermediary Manual* pt. F. Because the record demonstrates Mercy Catholic Medical Center provided the necessary documents to the Subcontractor, and the Intermediary employed the Subcontractor to conduct the audit and receive documents, the documents were accessible to the Intermediary and within its control.

While there is no question the Intermediary determines the APRA and corresponding adjustments to the hospital-specific rate and the Target Amount under § 413.86, it does not follow that the provider may not supply the data to the Intermediary through the on-site Subcontractor. The Subcontractor was entitled to receive cost documentation from Mercy Catholic Medical Center as the Intermediary's agent. An agency relationship may be established by: (1) express authority; (2) implied authority, to do all that is proper, usual and necessary for the authority actually granted; (3) apparent authority, as where the principal holds one out as agent by words or conduct; and (4) agency by estoppel. *See SEI Corp. v. Norton & Co.*, 631 F. Supp. 497, 501 (E.D. Pa. 1986).

Based on the relationship between the Subcontractor and Intermediary, the subcontractor likely had express or implied authority to receive documents from Mercy Catholic Medical Center. *See Medicare Intermediary Manual* pts. D-F. The Subcontractor undoubtably possessed the authority to conduct the reaudit of the graduate medical education costs. JA 153. As noted, adjustment of the hospital-specific rate and target amount is tied to the classification of hospitals' costs. *See* 42 C.F.R. § 413.86(l). Rationally, the Subcontractor should be authorized to receive documents for both cost reclassifications and adjustments to a hospital's specific rate and target amount. Alternatively, if the subcontractor lacked express authority to receive documents, the fact that it had conducted the graduate medical education reaudit, and had conducted all of Mercy Catholic Medical Center's audits since the "mid 70s," JA

24

153, demonstrates the Subcontractor had apparent authority to receive the documents. "It is well settled that apparent authority (1) 'results from a manifestation by a person that another is his agent' and (2) 'exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized.'" *Taylor v. People's Natural Gas Co.*, 49 F.3d 982, 989 (3d Cir. 1995) (quoting Restatement (Second) of Agency § 8 cmts. a & c (1958)). Mercy Catholic Medical Center reasonably believed the Subcontractor had the authority to receive the relevant documentation. The Intermediary and the Subcontractor were jointly obligated to safeguard the hospital's documents. Therefore, Mercy Catholic Medical Center fulfilled its burden by providing appropriate data to the Intermediary's agent.

Mercy Catholic Medical Center also contends it was entitled to present evidence not submitted to the Intermediary to the Provider Reimbursement Review Board for de novo review, and that the Board violated 42 U.S.C. § 1395oo(d) by not considering this evidence.[23] In this vein, Mercy Catholic Medical Center argues it should be allowed to present evidence comparing the prospective payment system and the graduate medical education base years—to effect an adjustment of the hospital-specific rate—until the Board has determined whether to approve a reaudit classification of operating costs to graduate medical education costs.

The Secretary maintains Mercy Catholic Medical Center's reliance on 42 U.S.C. § 1395oo(d) is unavailing. We agree. This statute does not require the Board to receive additional evidence not considered by the Intermediary, but only confers discretion on the Board as to what will be allowed into the administrative record. Taking Mercy Catholic Medical Center's argument to its logical conclusion, all statutory or regulatory deadlines imposed on providers for purposes of Medicare reimbursement would be inconsequential, since providers could proffer all required reports and documents by the time of the hearing.

Nevertheless, because we find Mercy Catholic Medical Center to have fulfilled its burden by presenting sufficient data for adjusting its hospital-specific rate and target amount to the Subcontractor, we will reverse the Board and the District Court on this issue. We will remand to the District Court to remand to the Provider Reimbursement Review Board with instructions to order the Intermediary to adjust Mercy Catholic Medical Center's hospital-specific rate and target amount to correspond to reclassified operating costs and graduate medical education costs.

---

[23]42 U.S.C. § 1395oo(d) provides in relevant part: "A decision by the Board shall be based upon the record made at such hearing, which shall include the evidence considered by the intermediary and such other evidence that may be obtained or received by the Board . . . ."

**IV.**

For the reasons stated, we will reverse and remand the judgment of the District Court for proceedings consistent with this opinion.