

2007 Decisions

**Opinions of the United States Court of Appeals for the Third Circuit**

8-2-2007

# PA Fedr Sportsmens v. Secretary Interior

Precedential or Non-Precedential: Precedential

Docket No. 06-1780

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"PA Fedr Sportsmens v. Secretary Interior" (2007). *2007 Decisions.* Paper 514.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/514

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-1780

_____

PENNSYLVANIA FEDERATION OF
SPORTSMEN'S CLUBS, INC.;
PENNSYLVANIA CHAPTER SIERRA CLUB;
PENNSYLVANIA TROUT, INC.;
TRI-STATE CITIZENS MINING NETWORK, INC.;
MOUNTAIN WATERSHED ASSOCIATION, INC.,

Appellants

v.

DIRK KEMPTHORNE,[*] SECRETARY,
UNITED STATES DEPARTMENT OF THE INTERIOR;
BRENT WAHLQUIST, ACTING DIRECTOR,
OFFICE OF SURFACE MINING
RECLAMATION AND ENFORCEMENT;
BRENT WAHLQUIST, REGIONAL DIRECTOR,

_____

[*]Pursuant to Fed. R. App. P. 43(c)(2), Dirk Kempthorne is substituted for his predecessor, Gale A. Norton, as Secretary of the Department of the Interior. Brent Wahlquist is substituted for his predecessor, Jeffrey D. Jarrett, as Acting Director, Office of Surface Mining Reclamation and Enforcement.

OFFICE OF SURFACE MINING RECLAMATION
AND ENFORCEMENT;


COMMONWEALTH OF PENNSYLVANIA,
DEPARTMENT OF ENVIRONMENTAL PROTECTION,

Intervenor in D.C.

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 03-cv-02220)
District Judge:  Honorable Sylvia H. Rambo

———

Argued March 26, 2007
Before:  FISHER, JORDAN and ROTH, *Circuit Judges*.

(Filed: August 2, 2007 )

Kurt J. Weist (Argued)
PennFuture
610 North Third Street
Harrisburg, PA  17101
        *Attorney for Appellants*

2

Tamara N. Rountree (Argued)
U.S. Department of Justice
Environment & Natural Resources Division
P.O. Box 23795
L'Enfant Plaza Station
Washington, DC 20026
    *Attorney for Appellees, Dirk Kempthorne, et al.,*
    *and Brent Wahlquist, et al.*

Dennis Whitaker (Argued)
Department of Environmental Protection
909 Elmerton Avenue, 3rd Floor
Harrisburg, PA 17110
    *Attorney for Appellee, Pennsylvania*
    *Dept. of Environmental Protection*

---

OPINION OF THE COURT

---

FISHER, *Circuit Judge.*

This is an appeal from a grant of summary judgment by the District Court sustaining two decisions of the United States Department of the Interior, Office of Surface Mining Reclamation and Enforcement. Plaintiffs challenge the agency's decisions to terminate a program deficiency notice issued pursuant to 30 C.F.R. § 732.17, and delete a required amendment that was codified at 30 C.F.R. § 938.16(h), both of which directed Pennsylvania to comply with the requirements of

3

30 C.F.R. § 800.11(e). For the reasons that follow, we conclude that the agency's decisions were inconsistent with its own regulations and regulatory obligations. We will therefore reverse the judgment of the District Court, in part, and set aside both agency actions.

## I. BACKGROUND

### A.

Plaintiffs in this case are several nonprofit public interest organizations, corporations, and coalitions dedicated to the preservation of Pennsylvania's environment and conservation of its natural resources. For the sake of convenience, they will be referred to collectively as the "Federation." The individual defendants have all been sued in their official capacities as administration officials. In addition, the Commonwealth of Pennsylvania, Department of Environmental Protection ("PADEP"), has been permitted to join as an intervenor-defendant. The Federation alleges that the Office of Surface Mining Reclamation and Enforcement ("OSM") has taken a position and performed actions inconsistent with its regulatory obligations under the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. § 1201, et seq. A short review of the origin and purpose of SMCRA is therefore in order.

Congress enacted SMCRA to provide protection against environmental degradation from coal mining and to clean up areas damaged by past coal mining. *See* 30 U.S.C. § 1202(a) ("It is the purpose of this Act to . . . establish a nationwide

4

program to protect society and the environment from the adverse effects of surface coal mining operations . . . ."). Many of the adverse effects of surface coal mining relate to the large number of abandoned and unreclaimed coal mining sites strewn across the nation. These sites "continue, in their unreclaimed condition, to substantially degrade the quality of the environment, prevent or damage the beneficial use of land or water resources, or endanger the health or safety of the public . . . ." 30 U.S.C. § 1202(h). SMCRA aims to promote the complete reclamation of these abandoned mining sites and seeks to assure that the untreated mine discharges of abandoned sites are abated. *See Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 233 (3d Cir. 1995). The statute empowers the Secretary of the Interior, through OSM, to promulgate regulations to realize these goals and oversee the regulatory program. 30 U.S.C. § 1211(c).

Significantly, however, SMCRA allows a State to steward its own regulatory program if it can administer that program according to federal standards. Under this "cooperative federalism" approach, individual States are expected to take the lead in regulation while the federal government oversees their efforts. Once a State program is approved, the State achieves "primacy" over the regulation of its surface mining program under SMCRA. Pennsylvania attained primacy in 1982. *See* 47 Fed. Reg. 33,050, 33,076 (July 30, 1982).

When a State has primacy, operators of surface coal mining sites are required to file an application for a surface coal mining and reclamation permit with the state regulatory authority. 30 U.S.C. § 1252(a). To receive a mining permit,

5

operators are required to submit a detailed reclamation plan for the site in question. This plan must provide sufficient information to demonstrate that complete reclamation can be accomplished. 30 U.S.C. §§ 1257(d), 1258(a). In addition, after the permit application has been approved, but before the permit is issued, applicants are required to file a performance bond with the regulatory authority. 30 U.S.C. § 1259(a). SMCRA's bonding program is designed to provide further assurance of "complete reclamation of mine sites." *Cat Run Coal Co. v. Babbitt*, 932 F. Supp. 772, 774-75 (S.D. W. Va. 1996). Under SMCRA, the bonds collected by States from mining operators must be "sufficient to assure the completion of the reclamation plan if the work had to be performed by the regulatory authority," *i.e.*, the State. 30 U.S.C. § 1259(a).

A conventional bond system ("CBS"), authorized by 30 U.S.C. § 1259(a), is sometimes referred to as a "full cost" system because the cost of the bond is not discounted or supplemented by any other source. Rather, the operator must pay the entire cost of the bond needed to complete reclamation in the event of forfeiture. *Id.* A CBS bond is site specific, covering the permit area upon which the operator conducts surface coal mining. *Id.* ("The bond shall cover that area of land within the permit area upon which the operator will initiate and conduct surface coal mining and reclamation operations within the initial term of the permit."). As mining and reclamation operations within the permit area are expanded, the permit holder must file additional bonds to cover the additional operations. *Id.* ("As succeeding increments of surface coal mining and reclamation operations are to be initiated and conducted within the permit area, the permittee shall file with

the regulatory authority an additional bond or bonds to cover such increments . . . .").

An alternative bond system ("ABS"), authorized by 30 U.S.C. § 1259(c), is a collective risk-spreading system that draws in part on a bond pool to cover the reclamation liabilities of each individual mining site. An ABS allows a State to discount the amount of the required site-specific bond to an amount that is less than the full cost needed to complete reclamation of the site in the event of forfeiture. Individual mine operators contribute to the bond pool, thereby sharing the liability of reclamation and compensating for the discounted site-specific bonds.

**B.**

Pennsylvania's past and present efforts to comply with its obligation to maintain a solvent bond system form the backdrop for this appeal. Pennsylvania first instituted an ABS to cover surface coal mines in 1981, even before it obtained primacy over mining activities in the Commonwealth. *See* 11 Pa. Bull. 2680 (August 1, 1981) (final rule implementing ABS). As previously noted, OSM approved Pennsylvania's surface coal mining regulatory program in 1982. 47 Fed. Reg. 33,050 (July 30, 1982); *see generally Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 268-72 (1981) (describing state program approval process). Under the approved program, Pennsylvania had the authority to implement either an ABS or CBS.

7

From 1982 until 2001, Pennsylvania opted for a bifurcated bond system, with surface coal mines, as well as coal refuse reprocessing operations and coal preparation plants, covered by an ABS, and underground coal mines and coal refuse disposal operations covered by a CBS. The ABS that Pennsylvania used for its surface coal mines consisted, in part, of site-specific bonds set below the cost of reclamation. These discounted site-specific bonds were supplemented by a statewide bond pool called the "Surface Mining Conservation and Reclamation Fund" ("PA SMCRA Fund"), 52 Pa. Stat. Ann. § 1396.18. The PA SMCRA Fund receives revenue from several sources, including the collection of a one-time, non-refundable, per-acre reclamation fee paid by individual operators of surface coal mines. That fee was originally $50 per acre, but was raised to $100 per acre in 1993. *See* 25 Pa. Code § 86.17(e).

On January 10, 1991, OSM's director notified PADEP that Pennsylvania's "alternative bonding system must be modified to provide the resources needed to reclaim existing permanent forfeiture sites within a reasonable timeframe and to ensure that future forfeiture sites will be reclaimed in a timely manner. These resources must be sufficient to complete the reclamation plan approved in the permit." On May 31, 1991, in a final rule conditionally approving a proposed state program amendment, OSM codified a "required regulatory program amendment," 30 C.F.R. § 938.16(h), directing Pennsylvania to submit information by November 1, 1991, indicating that the PA SMCRA Fund was solvent. Specifically, the rule required Pennsylvania to either "submit information, sufficient to demonstrate that the [ABS] can be operated in a manner that

8

will meet the requirements of 30 C.F.R. § 800.11(e)," or to amend its rules or otherwise amend its program by November 1, 1991, to be compliant with Federal standards. 56 Fed. Reg. 24,687, 24,719-21 (May 31, 1991). This "required amendment" was published in the Federal Register on May 31, 1991, as a final rule, following public notice as a proposed rule in the February 26, 1990 Federal Register and a period of public comment. *Id.*

In addition, on October 1, 1991, OSM sent Pennsylvania a letter pursuant to 30 C.F.R. § 732 ("Part 732 Notice"). Part 732 of the Code sets out the procedural requirements for submission, review and approval of state programs, *id.* §§ 732.11-732.16, along with the requirements for submission and approval of state program amendments. *Id.* § 732.17. As described by the District Court, a Part 732 Notice "is a document in which [OSM] notifies the State that its regulatory program must be amended to be in accordance with SMCRA and consistent with the Federal regulations . . . . Such notification may be necessary as a result of Federal regulation changes, State or Federal court decisions, or problems identified during oversight or other program review processes." *Pennsylvania Fed'n of Sportsmen's Clubs v. Norton*, 413 F. Supp. 2d 358, 364 (M.D. Pa. 2006).

The Part 732 Notice in this case indicated that Pennsylvania's regulatory program was no longer in compliance

9

with SMCRA and related federal regulations.[1]   Specifically,

_____

[1]The Part 732 Notice states, in part:

The specific event leading to this determination is an OSM Field Office evaluation of the adequacy of the Commonwealth's alternative bonding system (ABS).   This evaluation identified unfunded reclamation liabilities (for backfilling, grading, and revegetation) in excess of eight million dollars for current bond forfeiture sites alone.   The review also found that the ABS is financially incapable of abating or permanently treating pollutional discharges from bond forfeitures.   Even if no such discharges are created in the future, annual treatment costs for existing discharges are currently estimated at 1.3 million dollars.

Section 509(c) of SMCRA authorizes the Secretary to approve an ABS if it will achieve the objectives and purposes of the otherwise mandatory conventional bonding program. As set forth in 30 CFR 800.11(e), this provision means that the ABS must (1) assure that sufficient funds are available to complete the reclamation plans for any areas in default at any time, and (2) provide a substantial economic incentive for the operator to comply with all reclamation requirements.   As discussed in the preceding paragraph, these conditions no longer exist in Pennsylvania.

10

OSM explained that a field office evaluation had determined that Pennsylvania's ABS system was "financially incapable of abating or permanently treating pollutional discharges from bond forfeiture sites . . . ," and that the default reclamation requirements of 30 C.F.R § 800.11(e) were no longer satisfied. OSM acknowledged that Pennsylvania had already initiated the legislative process to increase the per-acre reclamation fee for the PA SMCRA fund (which would eventually lead to the $50 to $100 increase in 1993), but concluded that a more comprehensive analysis had to be conducted to determine if the revised ABS could reasonably be expected to generate sufficient funds. OSM required that Pennsylvania submit within sixty days "either proposed amendments or a description of amendments to be proposed to remedy the deficiency." In response to this demand, PADEP sent a letter on December 6, 1991, which briefly outlined its plan to address the bonding concerns. The letter described PADEP's efforts to initiate an actuarial review of its ABS and proposed a site-specific and umbrella "trust fund" approach to meeting its obligations under SMCRA. On March 3, 1992, OSM responded that PADEP's plan was still insufficient to satisfy the requirements of the Part 732 Notice.

On July 6, 1993, OSM approved Pennsylvania's per-acre reclamation fee increase from $50 to $100. 58 Fed. Reg. 36,139, 36,141. However, it emphasized the mutual understanding between OSM and Pennsylvania that this fee increase was a "stop-gap" measure, "an intermediate step to keep the shortage in the [PA SMCRA] Fund from further deteriorating," *id.* at 36,140, rather than a long term solution to the insolvency problem of the PA SMCRA Fund. The

11

Pennsylvania Environmental Quality Board agreed that "[t]o allow the [PA SMCRA] Fund to remain insolvent is not an acceptable bond program under Pennsylvania SMCRA or the Federal SMCRA."

Nearly two years later, on May 31, 1995, OSM sent the Secretary of PADEP a letter the Federation describes as a dunning letter reminding the Secretary of PADEP's outstanding obligations under OSM's Part 732 Notice to amend its program to address the PA SMCRA insolvency problem. The letter acknowledged an earlier October 1993 PADEP proposal to enhance its bonding system through a master trust fund, but observed that no action had been taken to implement this proposal. It directed PADEP to take immediate action to finalize these or other proposals.

A letter dated September 28, 1998, from PADEP to the Pennsylvania Coal Association's Director of Regulatory Affairs, underscored the magnitude of Pennsylvania's bonding program deficiencies:

> [PA]DEP is currently holding about $89 million in reclamation bonds, involving 178 coal operators and 102 financial institutions on 331 permits that have long been reclaimed, but have one or more discharges. Pennsylvania law prohibits the release of these bonds unless other financial assurances for the long-term treatment of water are provided. In addition, the bonds do not represent anywhere near the amount of money

12

required to provide for the long-term treatment of discharges in case of default by an operator.

This letter set forth various proposals for ameliorating the problem and concluded that "[t]he risk, and I believe certain consequence, of not dealing with this problem now and in earnest is the real possibility that some court will eventually decide the issues for us. The dog is no longer sleeping."

Less than a year later, on June 3, 1999, the Citizens for Pennsylvania's Future ("PennFuture"), on behalf of various parties, filed the advance notice required for a citizen's suit. This notice alleged, inter alia, that Pennsylvania's bonding system had been insolvent for over a decade, and that "[t]he amount of bond money posted for those sites [] is grossly insufficient for providing long term treatment." In the midst of settlement negotiations between PennFuture and PADEP, PADEP issued an October 6, 1999 news release announcing its decision to adopt a full-cost CBS that would "fully reflect the department's estimated cost for reclamation . . . ."[2]

OSM's initial position on this proposed solution to the insolvency of the PA SMCRA Fund was expressed at a

---

[2]On October 13, 1999, the Federation filed a related action in the Middle District of Pennsylvania seeking to compel Federal and State officials to comply with various provisions of SMCRA. *Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Kathleen A. McGinty*, No. 99-CV-1791. That action is stayed pending disposition of this matter.

13

November 18, 1999, meeting with PADEP representatives. The OSM concluded that "conversion to FCB [full cost bonding] for all current and future permits, as outlined by PADEP, would not resolve the outstanding [1991] Part 732 Notification" because it failed to address "current liability that has accrued against the ABS" and that PADEP could not dissolve the ABS without first addressing those existing liabilities. OSM explained that "the liability of a bond pool for the reclamation costs on a given forfeited site is not limited to any assigned amount. Rather its obligation, as stated in 30 C.F.R. § 800.11(e)(1), is to 'have sufficient money available to complete the reclamation plan for any areas which may be in default at any time.'" Consequently, OSM concluded that "PADEP's proposal cannot be approved in its entirety."

OSM clarified this position in a document sent to PADEP in a June 2000 memorandum in response to PADEP's request for guidance, explaining that "[f]ederal regulations do not authorize partial or full 'write off' of liability through ABS modification, and Pennsylvania must administer the program so that all liabilities accrued against the ABS are accounted for . . . ." Three months later, in a letter to the Secretary of PADEP dated October 11, 2000, OSM's Regional Director restated the position that "[a]ddressing forfeiture sites remains a critical aspect of OSM's 1991 notice on ABS insolvency and requires corrective action." The Regional Director explained that OSM had consistently interpreted the provisions of 30 C.F.R. § 800.11(e)(1) as "requiring that (1) a state is responsible to administer its ABS in a manner that provides sufficient funds, including funds for treatment of AMD [acid mine drainage] emanating from forfeiture primacy permits; and (2) an ABS can

14

only be terminated when all sites bonded under the system are successfully reclaimed or adequate replacement bonds are provided."

## C.

On August 4, 2001 PADEP formally announced the termination of its ABS and conversion to a CBS for surface mines, coal refuse reprocessing and coal preparation plants. In an attempt to resolve concerns regarding OSM's May 1991 Codified Required Amendment and Part 732 Notice, PADEP and OSM exchanged drafts of what would become the jointly authored "Pennsylvania Bonding Systems Program Enhancements" ("Program Enhancements Document"). The Program Enhancements Document was officially submitted to OSM on June 5, 2003, and provides descriptions of various aspects of Pennsylvania's bonding program, including summaries of actions taken and plans for future actions.

The Program Enhancements Document outlines Pennsylvania's August 2001 termination of the ABS and conversion to a CBS as well as revisions made and proposed to the CBS system subsequent to the conversion. Specifically, it explains that, after the conversion, Pennsylvania's existing and future mine operators could no longer rely on the Commonwealth's existing ABS to meet performance bond requirements. Existing operators originally permitted and bonded under the ABS fund were required to obtain new CBS bonds. New operators were also required to be permitted and bonded under a CBS bond and, consequently, were required to pay the full cost of bond coverage.

15

In addition, the Program Enhancements Document discusses revisions and proposed revisions to the CBS, including measures directed to OSM's original concerns regarding Pennsylvania's compliance with 30 C.F.R. § 800.11(e). For land reclamation on bond forfeiture sites, the Program Enhancements Document indicates that PADEP requested and the Pennsylvania General Assembly appropriated $5.5 million to address the deficit in the PA SMCRA Fund. Additionally, in the course of the ABS to CBS conversion, the Program Enhancements Document indicates that PADEP would continue to collect the $100 per-acre reclamation fee from mine operators filing for new permits for the PA SMCRA Fund "to cover forfeitures that occurred during the conversion."

Finally, the Program Enhancements Document includes a "Workplan" that prioritizes and allocates resources, purporting to "adequately provide for abatement or treatment of pollutional discharges on primary forfeiture sites." The document asserts that this Workplan "addresses more discharges than is required by federal SMCRA." Attached as an appendix to the Program Enhancements Document, the Workplan's full title is the "Alternate Bonding System Primacy Discharge Abatement Workplan." It explains that PADEP and OSM had completed an initial inventory of discharges on sites forfeited under the State's ABS. Briefly summarized, the Workplan describes PADEP's intent to clean up those discharges through a

16

"watershed approach" that utilizes various financial and programmatic resources.[3]

OSM's regional director sent a letter to PADEP on June 12, 2003, one week after submission of the Program Enhancements Document, stating that PADEP's "transition of existing active and inactive permits covered by the ABS conventional bonds . . . is now complete." The letter concurred with PADEP's conclusions that the measures taken by PADEP, as described in the Program Enhancements Document, were sufficient to remedy the deficiencies set forth in OSM's October 1, 1991 Part 732 Notice. OSM noted that Pennsylvania's CBS had been "revised and improved" and concluded that the actions taken by PADEP warranted termination of the Part 732 Notice.

In addition, two weeks later on June 26, 2003, OSM issued a proposed rule to remove the required amendment at 30 C.F.R. § 938.16(h). 68 Fed. Reg. 37,987. In that proposed rule, OSM asserted that the strategy outlined in the Program

---

[3]Those resources are: (1) Remining; (2) Reclamation-in-lieu of civil penalty agreements with active operators; (3) Surety reclamation/abatement of forfeited sites; (4) Bonds forfeited and collected from the site; (5) Excess funds from the ABS; (6) Title IV AML funding for insolvent surety companies; (7) Title IV 10% set-aside funding for insolvent sites in Qualified Hydrologic Units; (8) Additional Pennsylvania funding, such as Growing Greener; (9) Other funds or approaches that become available.

Enhancements Document would "satisfy [OSM's] concerns as to whether the [PA SMCRA] Fund can be operated in a manner that will meet the requirements of 30 C.F.R. § 800.11(e)." *Id.* at 37,988. OSM also stated "[s]ince we are now satisfied that [Pennsylvania's] bonding program enhancements adequately address[ed] our concerns about the ability of the bonding program to ensure the completion of the reclamation plan . . ., we are proposing the removal of the first portion of 30 C.F.R. 938.16(h)." *Id.* OSM invited public comments on whether it should consider the information submitted by Pennsylvania sufficient to remove the required amendment. *Id.* However, it stated that "[b]ecause we decided on June 12, 2003, that PADEP's bonding program enhancements satisfy the concerns expressed in our October 1, 1991, Part 732 Notification Letter, we are not seeking comments on the adequacy of those bonding program enhancements." *Id.* at 37,988-37,989.

The Federation submitted extensive comments on the proposed rule, as well as on OSM's decision to terminate the Part 732 Notice, in a 40-page memorandum to OSM's Regional Director on July 25, 2003. It asked the Regional Director to "reconsider and rescind [the termination of the 732 Notice], and . . . similarly reconsider and decline to adopt the proposed rule . . . ." The Federation characterized OSM's actions as a "Retreat from Responsibility," and a "flip-flop," and argued that Pennsylvania's new program failed to cover the costs of mine drainage treatment, and thus the full cost of reclamation, at many sites with post-mining discharges. The Federation complained that Pennsylvania was "writing off" ABS reclamation liabilities by leaving discharges from ABS forfeiture sites untreated and by transferring those liabilities to

18

other programs and sources of funding identified in the Workplan. In addition, the Federation observed that the Workplan lacked any meaningful and enforceable commitments to funding levels or implementation deadlines. To this end, the Federation argued that "[a] 'Workplan' is no substitute for [the] guarantee" of treatment required by SMCRA. Consequently, the Federation argued that the required amendment at 30 C.F.R. § 938.16(h) should not be removed.

On October 3, 2003, OSM declined the Federation's request that it rescind its June 12, 2003 letter terminating the Part 732 Notice, and stated that the Federation's request that OSM retain 30 C.F.R. § 938.16(h) "will be separately addressed in a FR [final rule] notice to be published in the near future." On October 7, 2003, OSM published a final rule in the Federal Register, announcing its removal of the required amendment at 30 C.F.R. § 938.16(h). 68 Fed. Reg. 57805. The final rule responded to the Federation's objections by explaining that "Pennsylvania's conversion from the ABS to full cost bonding, renders moot that portion of the required amendment concerned with the solvency of the Fund." *Id.* at 57806.

On December 8, 2003, the Federation commenced the underlying action in the District Court by filing a three-count complaint. The parties presented their cases, as is customary in agency review proceedings, in cross motions for summary judgment. The District Court denied the Federation's motion and granted OSM's cross motion to dismiss the complaint on all

19

three counts in a Memorandum and Order issued February 1, 2006.[4]  This timely appeal followed.

## II.  <u>JURISDICTION AND STANDARD OF REVIEW</u>

The District Court had subject matter jurisdiction over this matter under 28 U.S.C. § 1331 and 30 U.S.C. § 1276(a)(1). We have jurisdiction over the appeal from a final judgment of the District Court under 28 U.S.C. § 1291.  Our review of the District Court's grant of summary judgment is plenary, applying the same standard the District Court was required to apply. *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 201 (3d Cir. 2005). A grant of summary judgment is proper where, viewing the facts in the light most favorable to the non-moving party, the moving party has established that "there is no genuine dispute of material fact" and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Judicial review of agency actions under SMCRA is conducted according to the deferential standard applied to administrative actions.  SMCRA provides that "any action subject to judicial review under this subsection shall be affirmed unless the court concludes that such action is arbitrary, capricious, or otherwise inconsistent with law."  30 U.S.C. § 1276(a)(1).  This standard is consistent with the

---

[4]Dismissal of the first count, alleging that OSM had failed to follow administrative procedures required by law in rescinding the final rule and required amendment, is not appealed by the Federation.

Administrative Procedure Act's requirement that an agency's action be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Ohio River Valley Envtl. Coal., Inc. v. Kempthorne*, 473 F.3d 94 (4th Cir. 2006) (comparing SMCRA standard to APA standard). The scope of review under this standard "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

However, courts are "not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown*, 380 U.S. 278, 291 (1965); *see also Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 151 (3d Cir. 2004) (a reviewing court must ensure that an agency's ruling is not "inconsistent with applicable regulations"). The arbitrary and capricious standard of review applies equally to an agency's decision to pass a rule or rescind a rule. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42-43. Moreover, "an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Id.* at 42.

In determining whether an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise inconsistent with law we look to the statute delegating authority to the agency to make and enforce rules pursuant to the statute. *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). In this case, the statute is SMCRA, which

21

delegated rulemaking power to the Department of Interior (and consequently OSM, which is within the Interior Department). 30 U.S.C. § 1251(b) (authorizing permanent program regulations). Under the familiar two-step *Chevron* analysis, a court first looks to the statute to determine "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If the statute is silent or ambiguous, we move to step two of the inquiry. At step two, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. The Supreme Court has described the standard of review at step two as "arbitrary and capricious" review. *See United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); *see also National Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) ("[W]e defer at step two to the agency's interpretation so long as the construction is a reasonable policy choice for the agency to make." (internal quotes omitted)). We therefore approach agency regulations with great deference when reviewing them under *Chevron*'s second step.

## III. DISCUSSION

### A.

The OSM actions under review in this appeal are the agency's termination of the Part 732 Notice and removal of the codified required amendment at 30 C.F.R. § 938.16(h). Our review of these actions requires us to consider the applicability of 30 C.F.R. § 800.11(e) because OSM argues, and the District Court agreed, that Pennsylvania's conversion from an ABS to a CBS rendered § 800.11(e) inapplicable and mooted the issue of

22

compliance with the provision. *Pennsylvania Fed'n of Sportsmen's Clubs*, 413 F. Supp. 2d at 377 ("[A] conversion to the CBS amounts to a conversion of applicable statutory provisions and regulations [and as a result] any ongoing obligations from 30 C.F.R. 800.11(e) cease to apply."). As a threshold matter, however, we must determine whether Pennsylvania's ABS system was actually terminated by Pennsylvania's August 4, 2001 announcement, and, if so, whether OSM's actions in approving this purported termination of the ABS and conversion to a new bonding system were inconsistent with the applicable regulations and therefore an abuse of discretion.

The Federation argues that because Pennsylvania's ABS is part of the approved Pennsylvania regulatory program, it may be dissolved only through PADEP's submission and OSM's approval of a State program amendment deleting the authorization for an ABS from the program.[5] *See* 30 C.F.R. § 732.17(g) ("Whenever changes to laws or regulations that make up the approved State program are proposed by the State, the State shall immediately submit the proposed changes to the

_____

[5]OSM argues that the Federation has waived the argument that "Pennsylvania's ABS could be terminated only through a program amendment," Br. of Appellee OSM 39 n.9, by failing to raise it below. However, we believe this argument is preserved as a component of a larger issue argued by the Federation in the District Court, namely that "the ABS continues to exist as an approved part of the Pennsylvania program." Plaintiffs' Surreply Br., Doc. 55 at 6 n.6.

23

Director as an amendment. No such change to laws or regulations shall take effect for purposes of a State program until approved as an amendment."). However, Pennsylvania's program, as originally approved in 1982, provides for the option to implement either a CBS or an ABS. PA SMCRA states in relevant part that:

> The amount of the bond required shall be in an amount determined by the department based upon the total estimated cost to the Commonwealth of completing the approved reclamation plan, or in such other amount and form as may be established by the department pursuant to regulations for an alternate coal bonding program which shall achieve the objectives and purposes of the bonding program.

52 Pa. Cons. Stat. Ann. § 1396.4. OSM approved this bonding portion of PA SMCRA without condition. *See* 47 Fed. Reg. 33,079-80 (setting forth "§ 938.11 Conditions of state regulatory program approval."). As such, it is unnecessary for PADEP to codify a new regulation or amend its existing regulation. Under the current regulations, both state (52 Pa. Cons. Stat. Ann. § 1396.4) and federal (47 Fed. Reg. at 33,079-80), Pennsylvania is already authorized to pursue any bonding scheme it desires so long as that scheme achieves the ultimate objective of the bonding program, which is to guarantee sufficient funds for reclamation. The conversion from an ABS to a CBS is therefore not a "change[] to laws or regulations that make up the approved State program," 30 C.F.R. § 732.17(g), that triggers the SMCRA program amendment process. It is merely an exercise of

24

authority already granted to Pennsylvania in the existing regulations. OSM's actions in approving this conversion were therefore not arbitrary, capricious, an abuse of discretion, or otherwise inconsistent with law.

The Federation alights on the fact that Pennsylvania continues to collect the OSM-approved reclamation fee, which continues to supply the PA SMCRA Fund (or "ABS fund," App. 265). This fund, the Federation observes, may only be used to reclaim mining sites that had obtained bond coverage under the former ABS by paying the ABS reclamation fee. 25 Pa. Code §§ 86.17(e), 86.187(a)(1). This continued use of an ABS fund fed by an ABS reclamation fee, the Federation argues, confirms the continued existence of an ABS.[6] However, while it is true that the "ABS Fund" continues to exist in name, it no longer operates as an ABS, that is, as a bond pool to provide liability coverage for new and existing mining sites. Under the new terms of PADEP's Program Enhancements Document, existing and future operators can no longer rely on the PA SMCRA Fund for their bond coverage. Existing operators that were originally bonded under the ABS, and relied on the supplemental revenue in the Fund, were required to obtain new, CBS bonds. New

---

[6]OSM proposed a rule including a proposed amendment to 25 Pa. Code § 86.17(e) that would "discontinue the collection of [Pennsylvania's] Alternative Bonding System (ABS) $100 per acre reclamation fee." 71 Fed. Reg. 50868, 50869 (col. 1) (August 28, 2006). However, in its final rule, OSM has deferred its decision on the proposed change until final disposition of this appeal. 72 Fed. Reg. 19117, 19120 (col. 1) (February 23, 2007).

25

operators were and are required to be permitted and bonded under a CBS bond and, consequently, were and are required to pay for the full cost of their bond coverage. Thus, while there still is a legacy alternative bond fund that is being paid into and drawn on "to cover for forfeitures that occurred during the conversion," there is no longer a current or prospective ABS in Pennsylvania.

## B.

Although we have determined that Pennsylvania has effectively converted to a CBS and OSM did not abuse its discretion in approving that conversion, neither we nor OSM are yet out of the woods, so to speak. That is because we are still faced with the question of what obligations, if any, Pennsylvania has to ensure reclamation of sites forfeited before the conversion to a CBS began, plus any additional sites whose reclamation costs are still not fully covered by CBS bonds. To clarify, it is important we distinguish between the ABS as a bonding program, which no longer exists in Pennsylvania, and the particular mine sites bonded under that now defunct program. This distinction is a critical one as the conclusion that it is permissible under SMCRA for a State to dissolve its ABS program, in the manner Pennsylvania has, does not lead ineluctably to the conclusion that all liabilities accrued under that program are also automatically dissolved. In other words, there are still mining sites in Pennsylvania that were originally bonded under the ABS and forfeited prior to the CBS conversion. The question remains as to what obligations Pennsylvania has to provide for complete reclamation and treatment of these mining sites and their pollutional discharges.

26

OSM argues, and the District Court agreed, that whatever obligations Pennsylvania has, those obligations are not the ones set forth in 30 C.F.R. § 800.11(e). That provision, OSM maintains, simply ceased to apply once the prospective conversion to a CBS was announced and approved. OSM's position, simply stated, is that, because there is no longer an ABS in Pennsylvania, § 800.11(e) is no longer applicable and any obligations set forth in that provision are no longer binding. To reiterate, the District Court "agree[d] that a conversion to the CBS amounts to a conversion of applicable statutory provisions and regulations." *Pennsylvania Fed'n of Sportsmen's Clubs*, 413 F. Supp. 2d at 377. We do not agree with this conclusion entirely. We agree that the conversion to a CBS amounts to a change in statutory provisions going forward for those mining sites where complete reclamation costs are now fully covered by CBS bonds. However, we do not agree that sites forfeited before the conversion began are no longer subject to regulation under § 800.11(e).

To start, like the Federation, we find OSM's apparent "about face" on the issue of the applicability of 30 C.F.R. § 800.11(e)(1), and more generally Pennsylvania's outstanding and future reclamation liabilities, striking.[7] However, an agency

---

[7]OSM examined § 800.11(e)(1) in a 1991 final rule concerning the ABS of Missouri. 56 Fed. Reg. 21281 (May 8, 1991). In an effort to address an "unexpectedly large default" leaving substantial acreage unreclaimed at mines forfeited before September 1988, *id.* at 21283 (col. 1), 21286 (col. 2), Missouri submitted a program amendment to OSM that would

27

have modified the state's ABS "to provide money to cover only part of the cost of reclaiming sites that were in bond forfeiture prior to September 1, 1998." *Id.* at 21283 (col. 1). Rejecting that proposal, the agency explained:

> Reclamation liability under a bond pool must be continuous. The liability and obligation of an ABS does not disappear if the bond pool finds itself unable to meet its obligations as they mature, or its existing capital structure is impaired or its ability to perform any of its obligations is impaired. Additionally, existing liabilities of an impaired pool cannot be erased simply because proposed modifications to the pool will assure partial satisfaction of existing reclamation liabilities. Stated differently, if a bond pool comes up short of cash, the regulatory authority cannot and should not be able to simply "write off" any existing reclamation liabilities and then resume business as usual by proposed modifications to the previous ABS. This would be directly in conflict with the language of 30 CFR 800.11(e) and the purposes and objectives of section 509 of SMCRA, which provide that an ABS, must have available sufficient money to complete reclamation for any areas which may be in default at any time.

56 Fed. Reg. at 21286 (col. 2-3).

28

In the same rule, OSM rejected a proposal by Missouri to supplement its ABS with a CBS. Missouri proposed to allow new operations to "opt-out" of the ABS by posting a full cost conventional bond, 56 Fed. Reg. at 21287 (col. 1-2, Finding B.5(a)), and existing permittees to "buy out" of the ABS by posting such a bond and paying a one-time assessment into the State's ABS bond pool fund. *Id.* at 21287 (col. 2-3, Finding B.5(c)). OSM explained that the Missouri ABS fund had "continuing liability to reclaim sites forfeited in the past," *id.* at 21287 (col. 3), and rejected these CBS proposals because Missouri had provided "no assurances that past bond forfeiture liabilities [of the ABS] will be met." *Id.* at 21287 (col. 1-3). OSM reasoned that Missouri was relying on the ABS at the time of the bond forfeitures, which, coupled with the language of 30 C.F.R. § 800.11(e)(1), gave the Missouri ABS a "continuing liability to reclaim sites forfeited in the past." 56 Fed. Reg. at 21287 (col. 3).

Similarly, in a final rule involving West Virginia's ABS, OSM required the State "to eliminate the deficit in the State's alternative bonding system and to ensure that sufficient money will be available to complete reclamation, including the treatment of polluted water, at all existing and future bond forfeiture sites." 60 Fed. Reg. 51900, 51918 (col. 2) (October 4, 1995).

As described *supra*, Part I.B, in various communications with PADEP, OSM previously took a similar position with respect to Pennsylvania's ABS. OSM emphasized that "Federal regulations do not authorize partial or full 'write off' of liability through ABS modification, and Pennsylvania must administer

29

is not estopped from "changing a view [it] believes to have been grounded upon a mistaken legal interpretation [and] . . . an administrative agency is not disqualified from changing its mind . . . ." *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) (citations omitted). Indeed, *Chevron* itself involved an agency reversal on a significant question of statutory construction. *See Chevron*, 467 U.S. at 857-58. On the other hand, "[a]s a general matter, of course, the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views." *Pauley v. BethEnergy Mines*, 501 U.S. 680, 698 (1991); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 447 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view."). When an agency "sharply change[s] its substantive policy, then, judicial review of its action, while deferential, will involve a scrutiny of the reasons given by the agency for the change." *Natural Res. Def. Council, Inc. v. EPA*, 683 F.2d 752, 760 (3d Cir. 1982).

---

the program so that all liabilities accrued against the ABS are accounted for . . . ." OSM "insist[ed] that PADEP must deal with the current liability that has accrued against the ABS [through past bond forfeitures] as well as any future liability from the forfeiture or existing permits under the ABS that are unwilling or unable to convert to FCB." OSM made clear its conviction that this position was "mandated by the Federal regulations at 30 C.F.R. § 800.11(e)(1) . . . ," and "consistent with decisions it ha[d] issued with respect to ABS program amendments from Missouri and West Virginia."

30

Under these circumstances, OSM bears the burden of rationally explaining its departure from its previous position. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 41-44 (1983).

With respect to the step one of the *Chevron* inquiry – whether Congress has spoken directly to the question at hand – we agree with the District Court that "[t]he language of SMCRA itself does not address dissolution of an ABS one way or the other." *Pennsylvania Fed'n of Sportsmen's Clubs*, 413 F. Supp. 2d at 377. To state the issue more precisely, Congress has not set forth any requirements under SMCRA or any of its regulations dictating how a conversion from an ABS to a CBS is to be executed and how any remaining liabilities from an insolvent ABS are to be discharged. As SMCRA and its regulations are silent on the issue of dissolution of an ABS, we proceed to step two of the *Chevron* analysis where "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc.*, 467 U.S. at 483. The basic tenets of statutory construction apply to construction of regulations and "[our] starting point on any question concerning the application of a regulation is its particular written text." *Wilson v. United States Parole Comm'n*, 193 F.3d 195, 197 (3d Cir. 1999). The regulation at issue provides:

> OSM may approve, as part of a State or Federal program, an alternative bonding system, if it will achieve the following objectives and purposes of the bonding program:

31

(1) The alternative must assure that the regulatory authority will have available sufficient money to complete the reclamation plan for any areas which may be in default at any time.

30 C.F.R. § 800.11(e)(1).

OSM fixes on the words "may approve" and argues that the terms of the provision therefore refer only to the conditions for approval of ABS programs.[8]   However, this suggested narrow construction is contradicted by the more expansive language in § 800.11(e)(1), which requires that "the regulatory authority [] have available sufficient money to complete the reclamation plan for any areas which may be in default at any time . . . ."  "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). OSM's argument that the "'at any time component' . . . applies to the ABS that is the subject of the proposal and approval," Br. of Appellees at 40, is unavailing given that the words "at any

---

[8]In addition, PADEP points out that the section heading of § 800.11 is entitled "Requirement to *file* a bond" (emphasis added), and argues that the provision only sets forth those initial requirements for filing.  However, it is a "well-settled rule of statutory interpretation that titles and section headings cannot limit the plain meaning of statutory text where that text is clear." *M.A. ex rel. E.S. v. State-Operated Sch. Dist.*, 344 F.3d 335, 348 (3d Cir. 2003).

32

time" are immediately preceded by the words "any areas which may be in default." The context makes clear that the words "at any time" apply not to the ABS program in general, but to specific "areas", *i.e.*, mining sites bonded under the ABS. *See Textron Lycoming Reciprocating Engine Div. v. Automobile Workers*, 523 U.S. 653, 657 (1998) ("[I]t is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." (citation and quotations marks omitted)). Thus, a plain reading of the words "any areas which may be in default at any time" indicate that the obligations prescribed by § 800.11(e) are not restricted to the immediate circumstances surrounding the approval of an ABS, but are instead ongoing in nature and apply at any time, so long as those mining areas originally bonded under the ABS, and not yet converted to CBS bonds, still exist.

Furthermore, keeping in mind the distinction between sites bonded under the ABS and the ABS itself, we see no reasonable basis for OSM's assertion that a purely prospective process – the transition to a CBS initiated on August 4, 2001 – should have retroactive effects on obligations that already accrued and guarantees that were already made under the ABS while the ABS was still active. This assertion is inconsistent with the expansive language of § 800.11(e) insofar as it adds to the phrase "any areas which may be in default at any time" an implicit limitation – "until a new bonding system is in place for new or ongoing mine operations." Furthermore, it would allow the regulatory authority to disclaim or "write off" existing

33

reclamation liabilities,[9] a result which would be contrary to the fundamental purpose of SMCRA's bonding requirement, which is to ensure complete reclamation of mining sites in the case of forfeiture. *See Cat Run Coal Co.*, 932 F. Supp. at 774; 30 U.S.C. § 1259(a). Consequently, even under the deferential standard applicable to agency interpretations, OSM's construction of 30 C.F.R. § 800.11(e) is impermissible. *Mercy Catholic Med. Ctr.*, 380 F.3d at 151. We conclude that § 800.11(e) continues to apply to sites forfeited prior to the CBS conversion and that § 800.11(e) requires that Pennsylvania fulfill the obligations it voluntarily assumed to ensure that these sites are fully reclaimed.

## C.

Finally, we turn to Pennsylvania's Program Enhancements Document. This document provided the justification for Pennsylvania's claim that the deficiencies identified in OSM's 732 Notice and 30 C.F.R. § 938.16(h) amendment had been remedied. OSM is careful to emphasize that, for purposes of its review, it did not view the Program

_____

[9]At oral argument, counsel for the Federation analogized OSM's argument to that of a credit cardholder who cancels the card and then claims that his or her outstanding balance should be limited to the cash he has on hand. While we recognize that the analogy is imperfect, as Pennsylvania is not in the position of a debtor, we believe it illustrates the principle that accrued liabilities under a particular financial regimen do not simply disappear when an individual or entity abandons that regimen.

Enhancements Document as a means of complying with § 800.11(e) because it believed that Pennsylvania's bond conversion mooted the issue of compliance with that provision. As the District Court correctly observed, however, "the decision to terminate the Part 732 Notice was made after consideration of the actions taken over the years – actions that were described in the program enhancements document." *Pennsylvania Fed'n of Sportsmen's Clubs*, 413 F. Supp. 2d at 377. In light of our conclusion that § 800.11(e) continues to apply to sites forfeited prior to the conversion, the Program Enhancements Document takes on special significance. If, in fact, the Program Enhancements Document does not ensure compliance with § 800.11(e), then it is an inadequate response to OSM's 732 Notice and 30 C.F.R. § 938.16(h) amendment, both of which emphatically called for Pennsylvania to take measures to comply with its obligations pursuant to § 800.11(e).

As described *supra*, the Program Enhancements Document presents an elaborate array of proposals for discharge abatement. The Federation argues that many of these proposals are inadequate, but we need not reach that argument because we believe the Program Enhancements Document is inadequate for a more basic reason: none of the proposals described in it represent enforceable commitments. OSM and PADEP describe these proposals in the language of a guarantee, *see, e.g.*, Br. of Appellee PADEP at 31 (describing the Workplan as a "commitment, acknowledged by OSM [that] became a programmatic obligation"), but Pennsylvania is only obligated under the regulations to enforce the provisions of its approved State program. 30 C.F.R. § 733.11. In turn, OSM may only take oversight action against Pennsylvania for failure to

35

implement those OSM-approved provisions. 30 C.F.R. § 733.12. Because the Program Enhancements Document is not part of an approved program amendment, it is not part of the Commonwealth's approved State program, and Pennsylvania is therefore under no obligation to implement its "programmatic commitments." While we would not go as far as the Federation in describing the use of language such as "programmatic commitments" and "programmatic accountability" as bureaucratic obfuscation, we do agree that such references do not obscure the simple fact that the Program Enhancements Document sets forth policy aspirations, not enforceable obligations.

Even if we were to concede that PADEP is unlikely to disregard the goals described in the Program Enhancements Document, given the time and effort put into drafting it, SMCRA demands that "sufficient money" will be available "at any time" a discharge from an ABS bond forfeiture site must be treated. 30 C.F.R. § 800.11(e)(1). The plain language of this provision requires that Pennsylvania demonstrate adequate funding for mine discharge abatement and treatment at all ABS forfeiture sites. While the Program Enhancements Document appears to be a good faith effort by OSM and PADEP to allocate scarce resources, SMCRA requires that reclamation and treatment of all post-SMCRA mining areas be guaranteed. 30 U.S.C. § 1259; 30 C.F.R. § 800.11(e)(1). The Program Enhancements Document is a policy directive, not an

enforceable guarantee.[10]     Accordingly, OSM's actions in rescinding the October 1, 1991 Part 732 Notice and deleting the 30 C.F.R. § 938.16(h) amendment were inconsistent with SMCRA and OSM's own regulation, 30 C.F.R. § 800.11(e)(1), and therefore an abuse of discretion.

## IV.  **CONCLUSION**

Close to thirty years ago, through SMCRA, Congress dealt with the reclamation problem that then faced this country as a result of decades of coal mining that provided needed supplies of energy, but left many States and communities with land that was badly scarred, no responsible party to reclaim the land, and no taxpayer funds that would allow the federal or state government to do the work.  Pennsylvania was one of those States with such a problem.  At the same time, Pennsylvania had an abundance of coal, communities whose economies benefitted from coal mining, and a coal mining industry interested in doing the work.  To provide for reclamation and at the same time allow States such as Pennsylvania to continue mining, SMCRA

---

[10]The parties confirmed at oral argument that the administrative process has been initiated to codify the substantive proposals of the Program Enhancements document as a formal amendment to Pennsylvania's approved regulatory program.  We do not reach the question of whether a formal amendment incorporating the substantive proposals of the Program Enhancements Document would adequately address the concerns raised in OSM's 732 Notice and required program amendment.

37

established new stringent rules for permitting, bonding, mining and reclamation. Notably, it was also one of the first laws passed by Congress employing a new form of federalism, whereby States could assume primary responsibility for implementing the law with a limited amount of federal supervision. Pennsylvania's approved program provided an ABS as an alternative to full cost bonding, which allowed the cost and burden of bonding to be shared across the Commonwealth and the industry. Over the period in which the ABS was in place, significant mining operations took place by responsible operators who met their commitments fully, and produced needed coal while employing thousands of Pennsylvanians in well paying jobs.

However, as well intentioned as the ABS program may have been, within the first ten years of its operation, it became clear that the ABS left the Commonwealth with now unreclaimed land, unabated mine discharges, and a reclamation fund insufficient to meet the new obligations. In 2001, PADEP scrapped the ABS for existing and future mining operations, and converted to the full cost CBS. Since SMCRA was enacted thirty years ago, we are faced in this case, for the first time, with the question of what continued level of supervision OSM should maintain over a State's program where an ABS is converted to a CBS without firm financial guarantees of complete reclamation in place. Although Congress did not speak explicitly to its intention on this precise issue, its message to America in the form of SMCRA is clear enough – the environmental damage resulting from unreclaimed mining sites must be mitigated. To this end, we believe the only reasonable

conclusion in this case is that OSM supervision is required until full guarantees of reclamation are in place.

For the reasons set forth above, we will reverse the District Court's judgment with respect to Counts Two and Three of the Complaint, sustaining the agency actions in this case, and remand to the District Court with instructions to set aside OSM's June 12, 2003 termination of its October 1, 1991 Part 732 Notice, and the portion of OSM's October 7, 2003 final rule deleting the 30 C.F.R. § 938.16(h) amendment, both of which required that Pennsylvania bring its program into compliance with 30 C.F.R. § 800.11(e).